## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **EDWARD ALLEN MALONE,** : | |
| 2400 South Glebe Road, #816 : | |
| Arlington, VA  22206 : | |
| : | |
| Plaintiff, : | Case No.: |
| : | |
| v. : | **JURY DEMAND** |
| : | |
| **LEVY PREMIUM FOODSERVICE, LP,** : | |
| an Illinois Corporation : | |
| c/o C T Corporation System : | |
| 1025 Vermont Avenue, N.W. : | |
| Washington, D.C.  20005 : | |
| : | |
| **WASHINGTON SPORTS &** : | |
| **ENTERTAINMENT, LP,** : | |
| a Maryland Corporation : | |
| c/o C T Corporation System : | |
| 1015 15th Street, N.W., #1000 : | |
| Washington, D.C.  20005 : | |
| : | |
| and : | |
| : | |
| **LINCOLN HOLDINGS, LLC,** : | |
| a Delaware Corporation : | |
| c/o Corporation Service Co. : | |
| 1090 Vermont Avenue, N.W. : | |
| Washington, D.C.  20005 : | |
| : | |
| Defendants. : | |
| : | |

## COMPLAINT

1.    COMES NOW the Plaintiff, Edward Malone, by and through his counsel, the

Law Office of Jimmy A. Bell, P.C., a professional corporation, Janelle N.

Richards, Esq., and Jimmy A. Bell, Esquire, and respectfully presents this

complaint against the Defendants, Washington Sports & Entertainment, LP,

Lincoln Holdings, and Levy Premium Foodservice, LP, to enforce his rights under the, 42 U.S.C. § 1981, the District of Columbia Human Rights Act, and Common Law of the District of Columbia for acts of negligence, assault, false imprisonment, and intentional infliction of severe emotional distress.

## JURISDICTION

2.    Jurisdiction of this court is based upon 42 U.S.C. § 1981.

## VENUE

3.    Venue is proper in the District of Columbia as the Defendants operate a licensed business in the District of Columbia and the acts complained of occurred within the said jurisdiction.

## STATEMENT OF FACTS

4.    During all times mentioned in this Complaint, Plaintiff was, and still is, a citizen of the United States and he resided, and now resides in the State of Virginia.

5.    Plaintiff is a graduate of Stanford University (B.A.), and the George Mason University School of Law (J.D.); Plaintiff is also an attorney.

6.    At all times relevant to this Complaint, upon information and belief, Defendant Washington Sports & Entertainment, LP ("Washington") is a 55% owner of the Verizon Center.

7.    At all times relevant to this Complaint, upon information and belief, Defendant Lincoln Holdings ("Lincoln") is a 45% owner of the Verizon Center.

8.    The Acela Club is a private restaurant located on the 2nd Floor of the Verizon Center.

9.    At all times relevant to this Complaint, upon information and belief, Defendant

Levy Premium Foodservice, LP, ("Levy") operates the Acela Club.

10.    Plaintiff had a birthday party (the "party") at the Acela Club at the Verizon Center

on March 21, 2006 at the Washington Wizards v. New Jersey Nets game.

11.    In or about February 2006, Plaintiff spoke to one or all Defendants' agent,

employee, and/or representative Nicole Hallcomb ("Hallcomb") concerning the

party.

12.    Plaintiff spoke to one or all Defendants' agent, employee, and/or representative

Matt Long ("Long") concerning the party on March 11, 2006.

13.    In their discussions with Plaintiff, described in paragraphs 11-12, neither

Hallcomb nor Long presented Plaintiff with any dining contract or asked Plaintiff

if Plaintiff was willing to be the guarantor for his guests.

14.    Upon arriving at the party, Plaintiff told Acela manager Kenny Nichols

("Nichols"), an agent, employee, and/or representative of one or all of

Defendants, to bill each table separately.

15.    Plaintiff's guests were seated at about six (6) separate tables.

16.    Nichols agreed with Plaintiff's request as described in paragraph 14.

17.    At or about 9:30 p.m., and at the close of dining at the party, Plaintiff discussed

the bill with his guests who were dining at the same table as he was and agreed to

split the tab between Plaintiff and Carla Brown.

18.    At or about 9:30p.m. a waiter, who was one or all Defendants' employee, agent,

and/or representative, approached Plaintiff and demanded that he pay a check for

$38.

3

19. Plaintiff inquired as to whose check it was and the waiter told him that an unidentified woman sitting at a table had claimed that Plaintiff would "take care" of her tab.

20. Plaintiff never agreed to "take care" of her tab.

21. Plaintiff did not know who the unidentified woman was.

22. No agent, employee, and/or representative asked Plaintiff if he was going to pick up a woman's tab at the party.

23. Upon information and belief, the waiter described in paragraph 18 had simply allowed this woman to leave without paying and under the assumption that Plaintiff was going to pay for her tab.

24. Although he did not know who the unidentified woman was, Plaintiff agreed to pay the tab out of goodwill.

25. Thereafter, Plaintiff went downstairs to briefly retrieve a gift from another guest.

26. After retrieving the gift, Plaintiff was refused entrance back into the arena by a security guard who was an agent, employee, and/or representative of one or all Defendants.

27. The security guard required Plaintiff to walk around the arena for re-admission.

28. There was an elevator to the right of the security guard described in paragraph 26 which provides direct access to the Acela Club; however the security guard refused to allow Plaintiff to avail himself of that elevator.

29. When Plaintiff finally arrived at the F street entrance, Plaintiff was admitted into the arena, but was refused access to the 2nd floor by several security guards who

4

were an agent, employees, and/or representatives of one or all Defendants, notwithstanding his Acela club passes.

30.   Plaintiff explained the he had personal belongings in the Acela Club, including his coat, but he was still refused admission and was told that the Acela club was "closed."

31.   Plaintiff contacted Long, who agreed to send Nichols to permit him access to the Acela Club.

32.   During his conversation with Long described in paragraph 31, Long stated that "there are still some bills we need you to take care of, my friend."

33.   Plaintiff was confused and stated that he had already paid his bill and reminded Long that he had "never agreed to pay for [his] guests' meals."

34.   Plaintiff also reminded Long that Nichols agreed to bill everyone separately.

35.   After waiting twenty (20) more minutes for access to the Acela Club, a Caucasian woman, who was employed by the Verizon Center and was trying to gain access to the 2nd Floor attempted to open the doors and discovered they all were locked.

36.   Surprised, the woman described in paragraph 35 exclaimed, "Why are these doors locked? At least one of the doors should always be open."

37.   The woman described in paragraph 35 finally gained access to the 2nd floor and permitted Plaintiff to enter, although Plaintiff's friend, Dr. Michael Martin, was required to wait outside.

38.   When Plaintiff walked into the club, the woman described in paragraph 35 said, in a sarcastic voice, "Sir, your belongings are to your left."

39.    The woman described in paragraph 35 pointed to a counter at the bar near the entrance of the restaurant where Plaintiff saw his gifts and birthday cards.

40.    Neither Plaintiff's cake nor jacket was not on the counter described in paragraph 39.

41.    Plaintiff began walking to the north side of the restaurant (the area where the party was held) to find his jacket, keys, and the birthday cake.

42.    The woman described in paragraph 35 ordered, "Sir, come back over here!"

43.    In response Plaintiff stated that he wanted to look for his possessions.

44.    Nichols then told Plaintiff, "If I were you, Malone, I wouldn't tell anyone what I am going to do if I were you after what you and your people did.   They ate and they left.  You're finished.  I'm going to have you banned from here.  Take that cake that you didn't pay for and get out of here.  We can do two things.  We can bring out the bill or have escorted from here and we're put a ban on you.  You and your friends tried to get over on us.  I don't like games.  I heard you tell someone that your friends ate and walked out but "oh well, that's the way it goes."

45.    Plaintiff never said "oh well, that's the way it goes" in response to anyone's failure to pay their bill.

46.    Plaintiff told Nichols that if Plaintiff did make such a statement, that it was not in the context in which Nichols believed.

47.    Nichols responded, "I don't want to hear it.  I'm gonna get the bill for you to pay. And by the way, take this cake that you didn't pay for."

48.  An unidentified security guard who was an agent, employee, and/or representative demanded Plaintiff's identification.

49.  In response to the demand described in paragraph 48, Plaintiff asked, "why do I have to give you my I.D.?"

50.  In response to the question described in paragraph 49, the guard security said, "You were messing with the restaurant. Now you're messing with me. Don't make this a longer night for you than it already is. I can arrest you. Give me your I.D."

51.  Plaintiff gave the guard his driver's license in response to his demands described in paragraph 50.

52.  Nichols then presented Plaintiff a dining invoice for over $400.

53.  Plaintiff reminded Nichols that Plaintiff had instructed him to bill each table separately and that he had agreed to that arrangement.

54.  Nichols responded, "I know you told me that, but it didn't work out and now you're [Plaintiff] responsible for your guests."

55.  The security guard then threatened, "Pay or I am going to arrest you for theft. Your guests ate and ran, so just own up to it like a man and get out of here."

56.  Nichols took Plaintiff's credit card to the back of the restaurant to process it.

57.  Thereafter, Nichols soon returned and told Plaintiff that his credit card was declined and demanded payment.

58.  Plaintiff did not have any other credit cards with him.

59.  Plaintiff had spent most of his cash paying for his tab described in paragraphs 17 and 18.

60. Upon information and belief, Nichols had attempted to charge over $500 to Plaintiff's credit card on its first attempt, even though the invoice was for $440.

61. Plaintiff called Dr. Martin and asked Dr. Martin if he could help Plaintiff pay the tab since Plaintiff was under threat of arrest, to which Dr. Martin agreed.

62. Plaintiff told Nichols that Dr. Martin was willing to cover the remainder of the tab.

63. The security guard described in paragraph 46 sent other security guards to get Dr. Martin.

64. Upon Dr. Martin's arrival, Plaintiff instructed Nichols to charge $230 to Plaintiff's card and the difference to Dr. Martin.

65. Nichols charged Plaintiff credit card and provided Plaintiff with a receipt for $230.

66. Upon information and belief, Nichols charged Plaintiff $264.

67. Nichols charged Dr. Martin with the difference between the bill and the amount described in paragraph 65.

68. Thereafter, Plaintiff asked Nichols if he could talk to him.

69. Plaintiff stated "let's talk about this thing reasonably. All of the yelling was not necessary. I did not attempt to take advantage of the restaurant."

70. Nichols walked away and exclaimed to the security guard, "Can you please get this nigger out of my face!"

71. The security guard described in paragraph 48 said, "You paid, now get out of here!"

72. Plaintiff stated, "I need to be treated with dignity."

8

73. The guard said, "Dignity? Your friends ate and walked out. Don't mess with me. Dignity? I'll beat you up right here and nothing will happen. Just get out! If you keep talking I could arrest you for disorderly conduct. And how about resisting arrest?"

74. Plaintiff responded, "I need my jacket. My car keys are inside and it's snowing outside."

75. Nichols then allowed Plaintiff to look for his jacket and keys.

76. Plaintiff could not find his keys.

77. Plaintiff and Dr. Martin left the Verizon Center at or about 11:00 p.m.

78. At all times described in paragraphs 1-77, several female patrons were still inside the Acela Club looking at, pointing to, and laughing at Plaintiff, notwithstanding the statement that the Acela Club was "closed" described in paragraph 30.

79. Upon information and belief, Nichols often does favors exclusively for female guests at the Acela Club.

80. The Acela Club is supposed to be reserved only for those who have passes to enter into the club on the night of basketball or hockey games but, upon information and belief, Nichols often admits women into the club who do not have passes.

81. Upon information and belief, Nichols reduces the price of food for female guests.

82. On March 22, 2006, one of the guests to the party told Plaintiff that her table was never presented with an invoice.

83. The guest described in paragraph 82 stated that if she had gotten a bill, she would have certainly paid it and not left Plaintiff standing there with an unpaid bill.

9

84.  The guest described in paragraph 82 stated that the waiters at the Acela Club simply made no effort to collect money or present bills to the guests at the party.

85.  The following day, Plaintiff was refused entry to the Acela Club to retrieve his jacket, which contained his car keys.

86.  With Plaintiff's keys missing, Plaintiff was without a car for two (2) days.

87.  Plaintiff's car was stuck in a parking garage at 600 E Street, N.W., until Thursday the 23d of March, when AAA ("triple A") could get a special tow truck to the garage capable of towing Plaintiff's four-wheel drive vehicle.

88.  Plaintiff had to pay the dealer, Rosenthal Jaguar, for a replacement lock system and set of keys, costing $643.00.

89.  Had Plaintiff been allowed to return to the Acela club without delay, Plaintiff would not have lost his jacket and car keys; the 20-30 minute delay caused Plaintiff the loss of his keys.

90.  Upon information and belief, guests' tables at the event were billed separately, disproving the notion that there was a single tab for which Plaintiff was responsible.

91.  Upon information and belief, guest Edsel Guydon, Attorney-at-Law, literally had to flag down an unattentive server to get an invoice for the meal he had eaten.

92.  Mr. Guydon had previously asked Plaintiff how tables were to be billed, and Plaintiff informed Mr. Guydon that arrangements had been made for tables to be billed separately.

93.    At or around 8:30 p.m., Mr. Guydon also informed Plaintiff that Mr. Guydon's

receptionist, Kelli, and her female companion, who were also present at the event,

had informed Mr. Guydon that they were unprepared to pay their bill.

94.    After talking with Mr. Guydon, Plaintiff took Kelli and her female companion to

an outside balcony, spoke with them privately, and, because they had candidly

and earnestly sought help in the matter, loaned them $80.00 to pay their bill.

95.    Upon information and belief, Rod Sampson's table was billed separately and he

and his friend, MacArthur Taylor, paid their bill.

96.    The restaurant agreed to bill the tables separately and acted consistently with this

agreement throughout the evening.

97.    The tables were billed separately, but some servers were slow to deliver the bills

to the guests.

98.    Upon information and belief, some guests had to insist repeatedly to their servers

that a bill be brought to their tables, until they finally received a bill.

99.    Upon information and belief, some guests insisted repeatedly to their servers that

a bill be brought to their tables, yet bills were never brought by their servers.

### COUNT I

### <u>FALSE IMPRISONMENT</u>
### (All Defendants)

100.   Plaintiff re-pleads and re-alleges paragraphs 1 through 99, with the same force

and effect as if set forth separately at length herein.

101.   Defendants, by and though their agents, representatives, and/or employees

purposefully took Plaintiff's identification and credit cards, refusing to give them

back, and causing him to be there imprisoned.

11

102. Defendants, by and though their agents, representatives, and/or employees purposefully threatened Plaintiff with arrest if he attempted to leave the Acela Club, causing him to be there imprisoned.

103. Defendants unlawfully violated Plaintiff's personal liberty interests by falsely imprisoning Plaintiff without color of authority.

104. Plaintiff was detained against his will.

105. Defendants had no authority to imprison Plaintiff.

106. As a result of the actions by Defendants, Plaintiff suffered damage by being unlawfully held against his will for an extended period of time.

## COUNT II

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Defendants Washington and Lincoln)

107. Plaintiff re-pleads and re-alleges paragraphs 1 through 106, with the same force and effect as if set forth separately at length herein.

108. During Plaintiff's interaction with Defendants' agents, representatives, and/or employees, Defendants threatened and yelled at, and humiliated Plaintiff.

109. Defendants, by and though their agents, representatives, and/or employees, called Plaintiff a "nigger."

110. Defendants' conduct resulted in Plaintiff suffering extreme humiliation.

111. Defendants' actions toward Plaintiff were intentional and reckless, especially as Plaintiff should not have been required to pay other patrons' tabs.

112. Defendants' actions were so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and be regarded as atrocious and utterly intolerable in a civilized community.

12

113.   Defendants' actions, through their agents, employees, and/or representative, in

falsely accusing Plaintiff of avoiding his tab, screaming at him, using racial slurs

towards him, and Defendants' conduct described in paragraphs 4-90 was the

proximate cause of Plaintiff's resulting injuries.

## COUNT III

### NEGLIGENCE (IN TRAINING)
**(All Defendants)**

114.   Plaintiff re-pleads and re-alleges paragraphs 1 through 113, with the same force

and effect as if set forth separately at length herein.

115.   Defendants' agents, representatives, and/or employees, deprived Plaintiff of his

freedom from unlawful illegal imprisonment, without probable cause, when he

provided false information to justify the arrest and detention of Plaintiff.

116.   Defendants' agents, representatives, and/or employees, forced Plaintiff to pay for

services which he did not receive, nor was he obligated to pay.

117.   Defendants' agents, representatives, and/or employees, called Plaintiff a "nigger."

118.   Defendants have a duty to use reasonable methods to train their agents,

representatives, and/or employees to be competent and fit to perform his duties.

119.   An inference can be drawn from Defendants' agents, representatives, and/or

employees, deviation of the applicable standard of care in training their agents,

representatives, and/or employees, and Plaintiff's resulting injuries, namely,

Plaintiff's false imprisonment, emotional distress, assault, and violation of civil

rights.

## COUNT IV

### NEGLIGENCE (IN SUPERVISION)
### (All Defendants)

120.    Plaintiff re-pleads and re-alleges paragraphs 1 through 119, with the same force
and effect as if set forth separately at length herein.

121.    Defendants' agents, representatives, and/or employees, deprived Plaintiff of his
freedom from unlawful illegal imprisonment, without probable cause, when he
provided false information to justify the arrest and detention of Plaintiff.

122.    Defendants' agents, representatives, and/or employees, forced Plaintiff to pay for
services which he did not receive, nor was he obligated to pay.

123.    Defendants' agents, representatives, and/or employees, called Plaintiff a "nigger."

124.    Defendants have a duty to use reasonable methods to supervise their agents,
representatives, and/or employees while performing their duties.

125.    An inference can be drawn from Defendants' agents, representatives, and/or
employees, deviation of the applicable standard of care in supervising their
agents, representatives, and/or employees, and Plaintiff's resulting injuries,
namely, Plaintiff's false imprisonment, emotional distress, assault, and violation
of civil rights.

## COUNT V

### ASSAULT
### (Defendants Washington and Lincoln)

126.    Plaintiff re-pleads and re-alleges paragraphs 1 through 125, with the same force
and effect as if set forth separately at length herein.

127. Defendants, through their agents, representatives, and/or employees, acted with the intent and capability to do bodily harm to Plaintiff.

128. Defendants, through their agents, representatives, and/or employees, acted with actual malice.

129. Defendants, through their agents, representatives, and/or employees, actions caused Plaintiff to be put in reasonable apprehension of an imminent battery.

130. As a result of Defendants' conduct and actions, Plaintiff has suffered and will continue to suffer severe mental anguish.

## COUNT VI

## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1981
### (Defendant Levy)

131. Plaintiff re-pleads and re-alleges paragraphs 1 through 130, with the same force and effect as if set forth separately at length herein.

132. Plaintiff is African-American.

133. Defendants operate a place of public accommodation as contemplated by 42 U.S.C. § 1981 (the Verizon Center and the Acela Club).

134. Nichols walked away and exclaimed to the security guard, "Can you please get this nigger out of my face!"

135. Plaintiff made himself available to fully and equally enjoy, without discrimination or segregation, the goods, services, facilities, privileges, advantages, and accommodations of Defendants.

136. Plaintiffs, because of his race, were deprived of services while similarly situated persons outside their protected class were not deprived of those services.

137. Plaintiffs, because of his race, received services in a markedly hostile manner and in a manner that any reasonable person would find objectively unreasonable.

138. Defendants' deprivation of services and provision of services in a markedly hostile manner were intentional.

### COUNT VI

### VIOLATION OF CIVIL RIGHTS UNDER THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT § 2-1402.31
**(Defendant Levy)**

139. Plaintiff re-pleads and re-alleges paragraphs 1 through 138, with the same force and effect as if set forth separately at length herein.

140. Plaintiff is African-American.

141. Nichols walked away and exclaimed to the security guard, "Can you please get this nigger out of my face!"

142. Defendants operates a place of public accommodation as contemplated by DC Human Rights Act § 2-1401.2 (the Verizon Center and the Acela Club).

143. Plaintiff made himself available to fully and equally enjoy, without discrimination or segregation, the goods, services, facilities, privileges, advantages, and accommodations of Defendants.

144. Plaintiffs, because of his race, were deprived of services while similarly situated persons outside their protected class were not deprived of those services.

145. Plaintiffs, because of his race, received services in a markedly hostile manner and in a manner that any reasonable person would find objectively unreasonable.

146. Defendants' deprivation of services and provision of services in a markedly hostile manner were intentional.

16

## RELIEF SOUGHT

147.  Plaintiff re-pleads and re-alleges counts 1 through 146, with the same force and

effect as if set forth separately at length herein.

148.  Plaintiff requests the following relief:

149.  Compensatory and punitive damages in the amount of $1,500,000.00.

150.  Pre and Post-judgment interest.

151.  The costs of litigation, including reasonable attorney's fees and expert witness

fees.

152.  Such other relief that may be just.

## JURY DEMAND

153.  Plaintiff demands a trial by jury.

Respectfully submitted,

Jimmy A. Bell, Esq.
Law Offices of Jimmy A. Bell, P.C.
9610 Marlboro Pike
Upper Marlboro, MD 20772
Tel.: (301) 599-7620
Fax: (301) 599-7623
Bar No. 14639

Janelle N. Richards, Esq.
Law Offices of Jimmy A. Bell, P.C.
9610 Marlboro Pike
Upper Marlboro, MD 20772
Tel.: (301) 599-7620
Fax: (301) 599-7623
Bar No. 16520